IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

NEWTON BEY,

          Plaintiff,

vs.                                    No. 07-2424-STA-tmp

FEDERAL BUREAU OF PRISONS,
et al.,

          Defendants.

ORDER DENYING DEFENDANT NAIMEY'S MOTION TO DISMISS
ORDER GRANTING DEFENDANT NAIMEY'S MOTION FOR SUMMARY JUDGMENT
ORDER OF DISMISSAL
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
NOTICE OF APPELLATE FILING FEE

On June 12, 2007, Plaintiff Newton Bey, Bureau of Prisons ("BOP") inmate registration number 06629-031, who was, at the time, an inmate at the Federal Prison Camp in Millington, Tennessee, filed a pro se complaint pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1974), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. (Docket Entry ("D.E.") 1.) In response to an order issued on June 26, 2007 (D.E. 2), Plaintiff filed the documents required by the Prison Litigation Reform Act of 1996, 28 U.S.C. §§ 1915(a)-(b), on July 5, 2007 (D.E. 4). United States District Judge J. Daniel Breen issued an order on July 20, 2007 that, inter alia, assessed the civil filing fee, dismissed

certain claims and parties pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) & (iii) and 1915A(b)(1) & (2), and directed the Clerk to issue process for, and the marshal to effect service on the remaining defendants. (D.E. 5.) The only claims remaining in this action are an FTCA claim against the BOP and a Bivens claim against Dr. Nahem A. Naimey. The case was transferred to this judge on May 21, 2008. (D.E. 32.) In a separate order, the Court has granted the motion of the United States to dismiss the FTCA claim, pursuant to Fed. R. Civ. P. 12(b)(1), for want of subject-matter jurisdiction. (D.E. 35.)

On December 17, 2007, Defendant Naimey filed a motion for dismissal or, alternatively, for summary judgment, supported by a statement of undisputed facts, a legal memorandum, and the declarations of Clarrisa M. Greene and Dr. Naimey. (D.E. 23.) In his motion, Defendant Naimey argues that the complaint should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), because the complaint does not allege a violation of the Eighth Amendment. In the alternative, he argues that he is entitled to qualified immunity because no reasonable trier of fact could find that his treatment of Plaintiff violated the Eighth Amendment. Plaintiff responded to the motion on January 25, 2008. (D.E. 26.)[1]

---

[1] Pursuant to Local Rule 7.2(a)(2), Plaintiff's response to the motion was due within 30 days after service. Plaintiff's response was not timely, and he did not request an extension of time in which to respond. The Court will, in this instance only, exercise its discretion to consider Plaintiff's late-filed response.

Plaintiff's claim against Dr. Naimey arises under the Eighth Amendment, which prohibits cruel and unusual punishment. <u>See generally</u> <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). An Eighth Amendment claim consists of both objective and subjective components. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992); <u>Wilson</u>, 501 U.S. at 298; <u>Brooks v. Celeste</u>, 39 F.3d 125, 127-28 (6th Cir. 1994); <u>Hunt v. Reynolds</u>, 974 F.2d 734, 735 (6th Cir. 1992). The objective component requires that the deprivation be "sufficiently serious." <u>Farmer</u>, 511 U.S. at 834; <u>Hudson</u>, 503 U.S. at 8; <u>Wilson</u>, 501 U.S. at 298.

To satisfy the objective component of an Eighth Amendment claim, a prisoner must show that he "is incarcerated under conditions posing a substantial risk of serious harm," <u>Farmer</u>, 511 U.S. at 834; <u>Stewart v. Love</u>, 796 F.2d 43, 44 (6th Cir. 1982), or that he has been deprived of the "minimal civilized measure of life's necessities," <u>Wilson</u>, 501 U.S. at 298 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)). "The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishments Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." <u>Johnson v. Karnes</u>, 398 F.3d 868, 873 (6th Cir. 2005). "A prisoner's right to adequate medical care 'is violated when prison doctors or officials are deliberately

indifferent to the prisoner's serious medical needs.'" <u>Id.</u> at 874 (quoting <u>Comstock v. McCrary</u>, 273 F.3d 693, 702 (6th Cir. 2001)); <u>see also</u> <u>Blackmore v. Kalamazoo County</u>, 390 F.3d 890, 895 (6th Cir. 2004)("The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs. . . . Prison officials' deliberate indifference violates these rights '[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care . . . ' for a serious medical need.") (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). "Although the right to adequate medical care does not encompass the right to be diagnosed correctly, [the Sixth Circuit] has 'long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'" <u>Johnson</u>, 398 F.3d at 874 (quoting <u>Danese v. Asman</u>, 875 F.2d 1239, 1244 (6th Cir. 1989)).

The objective component of an Eighth Amendment claim based on a failure to provide adequate medical care requires that a prisoner have a serious medical need. <u>Blackmore</u>, 390 F.3d at 896; <u>Brooks</u>, 39 F.3d at 128. This component can be satisfied in two ways. "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment <u>or</u> one that is so obvious that even a lay person would readily recognize

the necessity for a doctor's attention.'" <u>Blackmore</u>, 390 F.3d at 897 (emphasis in original); <u>see also</u> <u>Johnson</u>, 398 F.3d at 874.

If a prisoner's need for medical attention is not obvious, "the seriousness of a prisoner's medical needs 'may also be decided by the effect of delay in treatment.'" <u>Blackmore</u>, 390 F.3d at 897 (emphasis omitted).[2] Where a prisoner complains about a delay in medical treatment, the Court will "examine the seriousness of a deprivation by examining the effect of the delay in treatment." <u>Napier v. Madison County, Ky.</u>, 238 F.3d 739, 742 (6th Cir. 2001). In those cases, "'[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical information in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" <u>Id.</u>; <u>see also</u> <u>Johnson</u>, 398 F.3d at 874.

The Sixth Circuit has emphasized that

> The "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. . . . <u>Napier</u> does not apply to medical care claims where facts

---

[2]    The Sixth Circuit elaborated:

These decisions involve prisoner claims of delay in treatment that caused injury, loss, or handicap. . . . Other examples involve delayed administration of medication. . . , or a prisoner's refusal to take the prescribed medication . . . , or occasional missed doses of medication . . . , or claims based on a determination by medical personnel that medical treatment was unnecessary. . . . Also within this branch are decisions involving whether the prisoner was treated adequately . . . or whether any delay in providing medical care was harmless . . . , or where the prisoner had a "very minor injury for which many people outside prison would not even think of seeking outside medical treatment."

<u>Id.</u> at 898 (citations omitted).

> show an obvious need for medical care that laymen would
> readily discern as requiring prompt medical attention by
> competent health care providers. <u>Napier</u> applies where the
> plaintiff's "deliberate indifference" claim is based on
> the prison's failure to treat a condition adequately, or
> where the prisoner's affliction is seemingly minor or
> non-obvious. In such circumstances, medical proof is
> necessary to assess whether the delay caused a serious
> medical injury.

<u>Blackmore</u>, 390 F.3d at 898. Where a prisoner's need for medical attention is obvious, "the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." <u>Id.</u> at 900.[3] In those cases, the prisoner may recover for the pain and suffering attributable to the delay. <u>Id.</u> at 899 ("In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition. Blackmore was suffering from appendicitis, and it is sufficient that the officers' delay in treatment of an obvious medical emergency posed a substantial risk of serious harm to Blackmore by subjecting him to unnecessary infliction of pain.").

---

[3]      <u>See also</u> <u>Garretson</u>, 407 F.3d at 797 ("Here, Garretson is a diabetic whose condition required insulin injections at regulated intervals—a medically required treatment which she did not receive while housed at Madison Heights. As a result of this omission, she was later admitted to the hospital. Even without specific medical records, the emergency hospital admission coupled with a stay of several days satisfies the objective requirement of a 'sufficiently serious' medical need under <u>Farmer</u> and <u>Napier</u>.").

To establish the subjective component of an Eighth Amendment violation, a prisoner must demonstrate that the official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834; <u>Wilson</u>, 501 U.S. at 297, 302-03. The plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. <u>Farmer</u>, 511 U.S. at 834; <u>Wilson</u>, 501 U.S. at 303; <u>Helling v. McKinney</u>, 509 U.S. 25, 32 (1993); <u>Woods v. Lecureux</u>, 110 F.3d 1215, 1222 (6th Cir. 1997); <u>Street v. Corrections Corp. of Am.</u>, 102 F.3d 810, 814 (6th Cir. 1996); <u>Taylor v. Michigan Dep't of Corrections</u>, 69 F.3d 76, 79 (6th Cir. 1995). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." <u>Farmer</u>, 511 U.S. at 835. Thus,

> <u>[a] prison official cannot be found liable under the</u> <u>Eighth Amendment for denying an inmate humane conditions</u> <u>of confinement unless the official knows of and</u> <u>disregards an excessive risk to inmate health or safety;</u> <u>the official must both be aware of facts from which the</u> <u>inference could be drawn that a substantial risk of</u> <u>serious harm exists, and he must also draw the inference.</u> This approach comports best with the text of the Eighth Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation,

cannot under our cases be condemned as the infliction of
punishment.

*Id.* at 837-38 (emphasis added; citations omitted); see also
Garretson v. City of Madison Heights, 407 F.3d 789, 796 (6th Cir.
2005) ("If the officers failed to act in the face of an obvious
risk of which they should have known but did not, then they did not
violate the Fourteenth Amendment."). Thus, medical malpractice does
not become a constitutional violation merely because the victim is
a prisoner. Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); see also
Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995) ("Deliberate
indifference . . . does not include negligence in diagnosing a
medical condition.").

     Defendant Naimey first seeks dismissal of the complaint,
pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim
upon which relief may be granted. The traditional standard for
assessing a Rule 12(b)(6) motion is as follows:

> "Dismissal of a complaint for the failure to state a
> claim on which relief may be granted is appropriate only
> if it appears beyond a doubt that the plaintiff can prove
> no set of facts in support of his claim that would
> entitle him to relief." [Brown v. Bargery, 207 F.3d 863,
> 867 (6th Cir. 2002). We must "construe the complaint in
> the light most favorable to the plaintiff [and] accept
> all well-pleaded factual allegations as true."
> Trzebuckowski v. City of Cleveland, 319 F.3d 853, 855
> (6th Cir. 2003) (reviewing dismissal under Federal Rule
> of Civil Procedure 12(b)(6)). Further, we hold pleadings
> filed by a pro se litigant "to less stringent standards
> than formal pleadings drafted by lawyers," Haines v.
> Kerner, 404 U.S. 519, 520 . . . (1972), and may not
> uphold the dismissal of such a pleading "simply because
> [we] find[] the plaintiff's allegations unlikely." Denton
> v. Hernandez, 504 U.S. 25, 33 . . . (1992).

<u>Thomas v. Eby</u>, 481 F.3d 434, 437 (6th Cir. 2007) (alterations in original); <u>see also</u> <u>League of United Latin Am. Citizens v. Bredesen</u>, 500 F.3d 523, 527 (6th Cir. 2007) ("The court must construe the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true and determine whether plaintiffs undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief."). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. <u>League v. United Latin Am. Citizens</u>, 500 F.3d at 527.

Shortly after the issuance of the decision in <u>Thomas</u>, the Supreme Court issued two opinions that appear to reach different conclusions about the amount of factual detail required in a complaint. In <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007), an antitrust case, the Supreme Court addressed the pleading standard for assessing a claim under § 1 of the Sherman Act:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," <u>Conley v. Gibson</u>, 355 U.S. 41, 47 . . . (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . , on

> the assumption that all the allegations in the complaint
> are true (even if doubtful in fact) . . . .

Id. at 1964-65 (citations and footnote omitted); see also id. at 1965 n.3 ("While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant 'set out in detail the facts upon which he bases his claim' . . ., Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.") (emphasis omitted).[4]

Two weeks later, in Erickson v. Pardus, 127 S. Ct. 2197 (2007) (per curiam), the Supreme Court vacated the dismissal of a lawsuit brought by a prisoner who alleged that he had received inadequate medical treatment. The Supreme Court emphasized the liberal pleading standard of Fed. R. Civ. P. 8(a)(2), id. at 2200, and the Plaintiff's pro se status, id.

The Sixth Circuit has stated that "[w]e read the Twombly and Erickson decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim." Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295-96 (6th Cir. 2008). In a footnote, the Sixth Circuit explained:

> We have previously "noted some uncertainty
> concerning the scope of" Twombly. Commercial Money Ctr.,
> Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 337 n.4
> (6th Cir. 2007). In particular, we have taken note of the
> Second Circuit's interpretation of Twombly as enacting a

---

[4]     The Supreme Court did disavow the "no set of facts" language from Conley v. Gibson that the Sixth Circuit cited with approval in Thomas. See 127 S. Ct. at 1968-69.

> "plausibility standard [which] did not significantly
> alter notice pleading or impose heightened requirements
> for all federal claims[, and] [i]nstead, . . . require[d]
> more concrete allegations only in those instances in
> which the complaint, on its face, does not otherwise set
> forth a plausible claim for relief." <u>Weisbarth v. Geauga
> Park Dist.</u>, 499 F.3d 538, 542 (6th Cir. 2007) (citing
> <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007)).

<u>Id.</u> at 296 n.1 (alterations in original); <u>see also</u> <u>United States v.
Ford Motor Co.</u>, 532 F.3d 496, 503 n.6 (6th Cir. 2008) ("In <u>Erickson
v. Pardus</u> . . . , the Supreme Court clarified <u>Twombly</u> by holding
that a prisoner bringing a § 1983 claim against his captor is not
required to state '[s]pecific facts' in their complaint . . . , and
<u>Twombly</u> itself suggests that its holding may be limited to cases
likely to produce 'sprawling, costly, and hugely time-consuming'
litigation.") (citation omitted).

In this case, the relevant factual allegations are as
follows:

> Plaintiff, Newton Bey, continues to be denied the
> proper health care treatment that he has been requesting
> for over four years. That is, to be sent to a neurologist
> for review of his health condition. Plaintiff continues
> to suffer from brain damage and nerve pains; he went to
> sick call on numerous occasions to speak with Dr. Namey
> [sic] about his declining condition. Further, Plaintiff
> requested to be sent back to a neurologist to receive an
> MRI test. Plaintiff's condition is deteriorating, and
> must be reviewed on a regular basis to determine (and
> hopefully prevent) any decline.

> With Dr. Namey denying Plaintiff Bey proper medical
> treatment, he is suffering irreparable harm. The Warden
> has been laced on notice for a potential constitutional
> violation.

> . . . .

On February 20, 2003, Plaintiff Bey received a "Consultation Report" from Charles M. Kenney, III, M.D. in Lexington, Kentucky. It revealed in pertinent part as follows:

> "There are small collections of CSF in the left anterior temporal and left inferior frontal regions. There are increased T2 signal in the brain adjacent to these areas. The appearance and location of these abnormalities is most consistent with sequela of prior traumatic injury with areas of encephalomalacial and area. Small arachonoic cyst could account for CSF collections, but would not account for the underlying brain abnormality. There are a couple of small foci of increased T2 signal in the peri-ventricular white matter representing mild ischemic'gliotic [sic] changes. There is no evidence of hemorrhage or mass. No area of normal contrast enhancement is seen. The ventricules are normal in size an [sic] configuration. Normal major vascular flow voids are seen."

Dr. Kenney's impression of this was "1) Non-specific left lower anterior temporal and inferior frontal abnormalities, but favor ancephalomalacia and gliosis likely from prior traumatic injury. 2) Mild ischemic//gliotic changes."

After leaving the Bureau of Prisons' Lexington facility and arriving at the Satellite Prison Camp in Millington in 2003, Plaintiff began to suffer from head pains more frequently. Plaintiff has been requesting the medical staff to conduct another MRI, as it seems every month the headaches get more frequent and severe. Plaintiff requests the Attorney General to take notice of the administrative remedy 387702-A1, taken here at SPC-Millington, Tennessee, quoting in pertinent part, "Relevant to portions of your medical record have been reviewed which reveal you have received neurological evaluations in the past and MRI was performed which revealed no significant findings." It should be noted that Dr. Namey [sic] has never ordered an MRI test, and has only conducted a "visual" partial physical, but no internal investigations into the brain trauma as mentioned by Dr. Kenney.

(D.E. 1 at 4-6.)

The complaint adequately alleges a violation of the Eighth Amendment, and the factual allegations are sufficient to put Dr. Naimey on notice of the basis for Plaintiff's claim. Although Defendant Naimey is correct that the allegation that an MRI was not performed is not actionable (D.E. 23-2 at 7-8),[5] the complaint, liberally construed, alleges that Plaintiff suffers from "brain damage and nerve pains," that "his condition is deteriorating," that he "began to suffer form head pains more frequently" and "it seems every month the headaches get more frequent and severe." The quotations from the report of Dr. Kenney appear to confirm that Plaintiff suffered some type of brain damage. He asserts that his condition should be "reviewed on a regular basis to determine (and hopefully prevent) any decline." He also asserts that Dr. Naimey is aware of his symptoms but, despite his frequent sick call visits, his symptoms continue to worsen. A fair inference from the language quoted above is that Plaintiff believes he is not receiving appropriate treatment for his condition. Those allegations appear to be sufficient to state a claim for violation of the Eighth Amendment.

Defendant Naimey's motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), is DENIED.

---

[5]    See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court.").

Defendant Namey has also moved for summary judgment on the ground that he is entitled to qualified immunity. "Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the alleged facts show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . .
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in the specific context of the case, not as a broad general proposition.

Saucier v. Katz, 533 U.S. 194, 201 (2001) (citation omitted); Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008). In this case, Defendant Naimey contends that Plaintiff cannot establish a constitutional violation. (D.E. 23-2 at 2-3.)

Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

In our view, the plain language of Rule 56(c) mandates
the entry of summary judgment, after adequate time for
discovery and upon motion, against a party who fails to
make a showing sufficient to establish the existence of
an element essential to that party's case, and on which
that party will bear the burden of proof at trial. In
such a situation, there can be "no genuine issue as to
any material fact," since a complete failure of proof
concerning an essential element of the nonmoving party's
case necessarily renders all other facts immaterial. The
moving party is "entitled to judgment as a matter of law"
because the nonmoving party has failed to make a
sufficient showing on an essential element of [his] case
with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation

omitted).

Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for

summary judgment is properly made and supported, an opposing party

may not rely merely on allegations or denials in its own pleading;

rather, its response must—by affidavits or as otherwise provided in

this rule—set out specific facts showing a genuine issue for

trial." In considering a motion for summary judgment, "the evidence

as well as the inferences drawn therefrom must be read in the light

most favorable to the party opposing the motion." Kochins v.

Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587-88 (1986) (same).[6]

---

[6]    Rule 56(e)(1) sets forth in detail the evidentiary requirements
applicable to a summary judgment motion:

A supporting or opposing affidavit must be made on personal
knowledge, set out facts that would be admissible in evidence, and
show that the affiant is competent to testify on the matters stated.
If a paper or part of a paper is referred to in an affidavit, a
                                                        (continued...)

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. Liberty Lobby, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

Moreover, Fed. R. Civ. P. 56(f) provides as follows:

---

[6]     (...continued)
sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

If a party when opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

"Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000); see also Good v. Ohio Edison Co., 149 F.3d 413, 422 (6th Cir. 1998); Plott v. General Motors Corp., 71 F.3d 1190, 1196-97 (6th Cir. 1995). Moreover, the Sixth Circuit has held that, unless the nonmoving party files a Rule 56(f) affidavit, a district court cannot decline to consider the merits of a summary judgment motion on the ground that it is premature. Wallin v. Norman, 317 F.3d 558, 564 (6th Cir. 2003).

In this case, Plaintiff served Dr. Naimey and the United States with requests for admission and requests for production of documents, and Defendants have filed a motion for a protective order. (D.E. 33.) In response, Plaintiff concedes that discovery should cease until Defendants' dispositive motions have been decided. (D.E. 34 at 1.) Although Plaintiff has not had the

opportunity for discovery, he has not filed a Rule 56(f) affidavit and he does not contend that he needs discovery to respond to the motion for summary judgment filed by Dr. Naimey. Therefore, the Court will decide the pending motion on the present record.

Defendant Naimey has submitted his own factual declaration, which states, in pertinent part, as follows:

> 1.    I am presently the Clinical Director at the Federal Correctional Institution ("FCI") in Memphis, Tennessee. I have held this position since April 2000. Prior to that date I was a Senior Medical Officer, General Practice, at FCI Memphis. I first began working for the Federal Bureau of Prisons in July 1995.

> 2.    As the Clinical Director, I function as the primary physician for a full scope and range of medical services to the inmates confined at FCI Memphis. Additionally, I am responsible for the clinical care provided to inmates at FCI Memphis, including but not limited to, maintaining the quality of health records, supervising Medical Officers, and evaluating patient care through an ongoing quality assurance program. In this position, I have access to the official records compiled and maintained by the Federal Bureau of Prisons, many of which are located in the Bureau of Prisons computerized records (SENTRY) and inmate files. These documents include records of inmates currently incarcerated at FCI Memphis, in particular, the records pertaining to Newton Bey, Federal Register Number 06629-031. Mr. Bey has been designated to FCI Memphis since May 13, 2003.

> 3.    Because Mr. Bey has a chronic medical condition, hypertension, he is assigned to the Chronic Care Clinic at FCI Memphis. Inmates assigned to the Chronic Care Clinic are seen at least once every three months to monitor their condition. In addition to appointments to monitor Mr. Bey's hypertension, he reports to Health Services as needed for any other medical concerns. In his case, Mr. Bey reports to health services frequently complaining of "headaches," "bacteria" and "infection" in his head. Mr. Bey also states on occasion that something is "eating his brain." Each time Mr. Bey raises these concerns, he is thoroughly

examined and found to be functioning normally, without slurred speech or other impediments that would signify brain trauma. In fact, although Mr. Bey insists that he has a "progressive disease of the brain," his condition has remained stable since his March 13, 2003, designation to FCI Memphis.

4.    The following is a summary of Mr. Bey's medical record from his designation to FCI Memphis in March of 2003 to the present.

5.    The Medical Summary of Federal Prisoner in Transit[,] dated February 13, 2003, prepared for Mr. Bey's transfer from the Federal Medical Center, Lexington, Kentucky ("FMC Lexington") to FCI Memphis indicates that Mr. Bey had been diagnosed with Gilbert's Syndrome, a benign medical condition that does not require any treatment, Hypertension[,] and [he] had a history of tremors.

6.    Prior to his transfer to FCI Memphis, Mr. Bey was seen by a neurologist during a consultation in the neurology clinic at FMC Lexington. Mr. Bey's medical record indicates that Mr. Bey was evaluated by a neurologist due to complaints of a "sensation of bleeding in the brow with a burning sensation starting in his head and going to his left arm." The neurologist recommended an MRI but also explained to Mr. Bey that his tremors could be benign. An evaluation by a psychiatrist was also scheduled. Mr. Bey received an MRI on February 20, 2003. The MRI indicated that there is no evidence of any hemorrhaging or mass in Mr. Bey's brain but did reveal the likelihood of prior traumatic injury such as a stroke with irreversible but not life-threatening injury.

7.    On March 5, 2003, Dr. Rios, at FMC Lexington, met with Mr. Bey to discuss the results of an MRI taken February 20, 2003. Dr. Rios informed Mr. Bey that his MRI showed no signs of tremors, bleeding or blood clots and did not reveal anything significant. Mr. Bey stated that he was still worried because the MRI showed a past history of injury but was assured that he did not have any significant conditions.

8.    Mr. Bey received his intake screening at FCI Memphis on March 13, 2003. Based on his medical history, medical staff conducting the screening placed Mr. Bey in the Chronic Care Clinic for psychiatry and hypertension.

Mr. Bey's medical record indicates a history of psychiatric illness including depression and hypochondriasis. Psychiatric consultation with Mr. Bey also indicates that he is fixed on the idea that he has a progressive neurological disorder and that his treating physicians are not treating him properly.

9. On April 4, 2003, Mr. Bey reported to the Chronic Care Clinic for routine evaluation. The attending physician noted that Mr. Bey had been evaluated by neurologists several times at FMC Lexington. Additionally, Mr. Bey received an MRI at FMC Lexington on February 20, 2003, that showed nothing significant as reported by the neurology department, however, Mr. Bey stated that he wanted another assessment and a second opinion from another neurologist. The physician noted that Mr. Bey complained of bleeding, burning sensation and numbness in his brain, and that he believed he had an infection from dental work that caused his tremors and other medical complaints. The physician also noted that Mr. Bey expressed dissatisfaction with the neurologist and other medical explanations for his symptoms. The physician noted that he discussed at length the results of Mr. Bey's MRI and reassured him that he did not have a neurological condition.

10. From April 4, 2003 to the present, Mr. Bey has been evaluated by medical staff at FCI Memphis on approximately sixty (60) occasions. Many of these visits are routine appointments for follow-up in the Chronic Care Clinic to monitor Mr. Bey's hypertension. As noted in Mr. Bey's medical record on May 3, 2007, his hypertension is well-controlled with medication. Mr. Bey's complaints range from chest pain to an infection in his brain. During each visit, Mr. Bey is fully evaluated by medical staff, treated as necessary and educated regarding the plan of treatment. To date, medical staff have not found any neurological problems and Mr. Bey has been repeatedly informed of staff findings.

11. In an administrative note dated August 29, 2007, Mr. Bey's Medical Provider, Dr. Prince, a staff physician at FCI Memphis, noted that Mr. Bey denied having migraines but insisted that he have another MRI. Dr. Prince reviewed Mr. Bey's MRI with him and explained to Mr. Bey that it indicated that he had suffered a stroke at some point but that the effects of the stroke could not be repaired or treated. Dr. Prince noted that

Mr. Bey focused on the word "sequela" in the MRI report
and thought that it meant "disease." Dr. Prince informed
Mr. Bey that sequela referred to a "history of" or "chain
of events" and in his case indicated that Mr. Bey has a
prior history of traumatic injury. Additionally, the MRI
indicated that Mr. Bey has areas of "enoephalomalacia" or
"permanent brain injury." Dr. Prince further informed Mr.
Bey that as he ages he may experience cognitive loss but
that this would be treated with emotional therapy to help
him deal with the loss of function as opposed to surgery.
Dr. Prince also explained to Mr. Bey that further testing
would not change the diagnosis and, therefore, is not
warranted at this time. Additionally, Mr. Bey admitted
that he did experience relief from his headaches and pain
by taking aspirin.

12. From August 29, 2007, to November 2, 2007, Mr.
Bey did not report to Health Services at FCI Memphis with
any medical complaints.

13. On November 2, 2007, Mr. Bey visited Health
Services for routine follow-up in the Chronic Care
Clinic.

(Naimey Decl., ¶¶ 1-13.) Attached to Defendant Naimey's affidavit

are copies of Plaintiff's medical records, including the report of

the neurologist who examined him at FMC Lexington.

In his own factual affidavit, Plaintiff states in

pertinent part as follows:

2. Dr. Naimey concluded prior to the psychiatrist,
that I was a hypochondriac, without being an expert in
the field. After my complaint was filed against Defendant
Naimey was I then evaluated by a psychiatrist. . . .

3. I complained to the medical staff in Lexington
and Millington Camp of my head pains and over the last
year or so the pain has increased around the temple area.
This is the same area the MRI exposed the fact trauma
existed.

4. I have been to the medical staff approximately
over 60 times according to Defendant Naimey and every

time I complained of head pain but the only treatment I received was a blood pressure check.

5. It is not only MRI I was requesting, but requested to be treated by any means necessary. Approximately every visit I have complained of head pains.

6. The medical staff was on notice of the severity of my pain but they refused me treatment.

7. Dr. Naimey's affidavit of 22 Oct. 2007, indicates that I refused medical treatment for my complaints of a progressive brain disease, but according to the medical record, this was for a psychiatrist evaluation, not a medical test.

(Affidavit of Newton Bey, dated Jan. 23, 2007,[7] ¶¶ 2-7) (D.E. 26 at 13-14).)

Applying the facts of the instant case to the legal standards, Defendant Naimey argues that Plaintiff did not have a serious medical need. (D.E. 23-2 at 6-7.) Plaintiff does not have a medical condition that has been diagnosed as requiring treatment. See supra pp. 4-5. The MRI performed in 2003 indicated that Plaintiff probably had "prior traumatic injury such as stroke with irreversible but not life-threatening injury," Naimey Decl., ¶ 6, that "the effects of the stroke [cannot] be repaired or treated," id., ¶ 11, and that, as Plaintiff ages, "he may experience cognitive loss but that this would be treated with emotional therapy to help him deal with the loss of function as opposed to surgery, id. Thus, while Plaintiff apparently experienced brain

---

[7] This appears to be a typographical error, as the affidavit was clearly executed in response to the affidavit submitted by Dr. Naimey.

trauma, such as a stroke, at some time, no physician has concluded that ongoing treatment for that injury is necessary or helpful. Plaintiff has not submitted any medical evidence to the contrary.

The objective symptoms about which Plaintiff complained were headaches. (Bey Aff., ¶¶ 3-4.) It is not obvious that headaches, unaccompanied by other symptoms, are sufficiently severe to require treatment by a physician. <u>Clark v. Case</u>, No. 91-6180, 1992 WL 60215, at *2 (6th Cir. Mar. 27, 1992) ("Although Clark complains of headaches, he has not demonstrated a serious medical need sufficient to justify the CAT scan he demands.").[8] Therefore, the Court concludes that Plaintiff has not come forward with sufficient evidence to raise a triable issue as to whether he suffered from a serious medical need.

Even if it were assumed that Plaintiff had a serious medical need, Plaintiff has not produced sufficient evidence to raise a triable issue as to whether Defendant Naimey was deliberately indifferent. Plaintiff received an MRI in early 2003, shortly before his transfer to FCI Memphis, and the test revealed no treatable abnormalities. (Naimey Decl., ¶¶ 6, 11, Ex. D.) During his intake interview at FCI Memphis on April 4, 2003, the attending physician "discussed at length the results of [Plaintiff's] MRI and reassured him that he did not have a neurological condition." (<u>Id.</u>,

---

[8]    This is not a case in which Plaintiff claims that he has been injured by a delay in treatment. <u>See</u> <u>supra</u> pp. 5-6. Even if it were, Plaintiff has not submitted any verifying medical evidence documenting the effect of any delay.

¶ 9.) Since that time, Plaintiff has been seen by medical staff at FCI Memphis on approximately sixty (60) occasions for a variety of complaints. (Id., ¶ 10; see also Bey Aff., ¶ 4.) In response to his complaints of headaches and other neurological concerns, he has been "thoroughly examined and found to be functioning normally, without slurred speech or other impediments that would signify brain trauma." (Naimey Decl., ¶ 3.) Plaintiff's neurological condition "has remained stable" since he arrived at FCI Memphis on March 13, 2003. (Id.) He has been prescribed aspirin for his headaches and other pain, and he has admitted that that therapy has relieved his symptoms. (Id., ¶ 11.) Plaintiff has offered no medical evidence to the contrary.[9]

Even if Plaintiff could present some evidence that the evaluation by medical staff is incorrect and that there is some diagnostic tool or treatment that has been overlooked, Plaintiff will have established, at most, medical malpractice, not deliberate indifference. Estelle, 429 U.S. at 105-06; see also Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995) ("Deliberate indifference . . . does not include negligence in diagnosing a medical condition."). Dr. Naimey has explained that an MRI is not indicated because (i) an MRI was performed in 2003 and (ii) there has been no

---

[9]     Plaintiff had also been diagnosed by a psychiatrist as suffering from hypochondriasis. Specifically, "[p]sychiatric consultation with Mr. Bey also indicates that he is fixed on the idea that he has a progressive neurological disorder and that his treating physicians are not treating him properly." (Id., ¶ 8 & Ex. D.) While at FCI Memphis, Plaintiff has sometimes refused psychiatric treatment. (Id., Ex. E; Bey Aff., ¶ 7.)

change in Plaintiff's symptoms, such as impaired speech, that warrants further diagnostic tests. Plaintiff counters that Dr. Naimey is not a neurologist (D.E. 1 at 4) or a psychiatrist (Naimey Decl., ¶ 2), but those observations, to the extent they are probative at all, tend to undercut a finding of deliberate indifference.

Because Plaintiff has come forward with insufficient evidence to permit a jury to find either a serious need or deliberate indifference, he has not established an Eighth Amendment violation and Dr. Naimey is entitled to qualified immunity. The Court GRANTS Dr. Naimey's motion for summary judgment.

The Court has, in a separate order, DISMISSED the complaint against the United States. Because the claims against all parties have been dismissed, the case is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment for Defendants. All pending motions are DENIED as moot.

The Court must also consider whether Plaintiff should be allowed to appeal this decision in forma pauperis, should he seek to do so. The United States Court of Appeals requires that all district courts in the circuit determine, in all cases where the appellant seeks to proceed in forma pauperis, whether the appeal is frivolous. Floyd v. United States Postal Serv., 105 F.3d 274, 277 (6th Cir. 1997). Twenty-eight U.S.C. § 1915(a)(3) provides that

"[a]n appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."

Pursuant to the Federal Rules of Appellate Procedure, a non-prisoner desiring to proceed on appeal in forma pauperis must obtain pauper status under Fed. R. App. P. 24(a). See Callihan v. Schneider, 178 F.3d 800, 803-04 (6th Cir. 1999). Rule 24(a)(3) provides that, if a party was permitted to proceed in forma pauperis in the district court, he may also proceed on appeal in forma pauperis without further authorization unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis." If the district court denies pauper status, the party may file a motion to proceed in forma pauperis in the Court of Appeals. Fed. R. App. P. 24(a)(4)-(5).

The good faith standard is an objective one. Coppedge v. United States, 369 U.S. 438, 445 (1962). The test under 28 U.S.C. § 1915(a) for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any non-frivolous issue. Id. at 445-46. The same considerations that led the Court to grant Defendants' motions to dismiss or for summary judgment also compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith. Leave to proceed on appeal in forma pauperis is, therefore,

DENIED. If Plaintiff files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days.

IT IS SO ORDERED this 10th day of October, 2008.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE